912 A.2d 168 (2006)
389 N.J. Super. 181
Debra S. SMERLING, Magda Claude, and Sheila Smerling, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
HARRAH'S ENTERTAINMENT, INC., Harrah's Operating Company, Inc. d/b/a Harrah's Atlantic City, and Harrah's Atlantic City, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted November 9, 2006.
Decided December 13, 2006.
*169 Wacks & Hartmann, for appellants (William J. Pinilis, Morristown, of counsel and on the brief; Beth C. Manes, on the brief).
Cooper Levenson April Niedelman & Wagenheim, Atlantic City, for respondents (Gerard W. Quinn, on the brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
PARRILLO, J.A.D.
At issue is whether plaintiffs' consumer fraud action against a licensed casino hotel alleging false and misleading promotional advertising is preempted by the Casino Control Act, N.J.S.A. 5:12-1 to -210. Stated somewhat differently, does the Casino Control Commission (CCC), by virtue of its comprehensive regulation over New Jersey's casino industry, have exclusive jurisdiction over all matters of casino advertising so as to bar a patron's statutory consumer fraud claims in this instance. We answer in the negative, reverse the *170 trial court's Rule 4:6-2(e) dismissal, and reinstate plaintiffs' complaint.
The facts material to resolution of this issue are uncomplicated and for the most part undisputed. Plaintiffs, Debra and Sheila Smerling and Magda Claude, were patrons of an Atlantic City casino hotel owned by defendants Harrah's Entertainment, Inc., Harrah's Operating Company, Inc., and Harrah's Atlantic City, Inc. (collectively Harrah's or defendants). They allege they were induced to visit Harrah's casino by two promotional schemes run by defendants offering cash incentives that were never made available to them. One such promotion involved an advertisement titled "$15 BIRTHDAY CASH!" offering a coupon stating:
$15 BIRTHDAY CASH! Offer valid August 1 or August 10, 2003 only. Must present coupon at Total Rewards Center. Hours of operation for Total Rewards Center:
SunFri: 8am12 Midnight
Sat: 8am2am
Valid at Harrah's Atlantic City only.
Debra Smerling Valid 08/01/03 or 08/10/03
The only requirement for receiving the cash was to "present [a] Total Rewards card and valid photo I.D. upon redemption." After receiving the solicitation in the mail, both Debra and Magda decided separately to celebrate their birthday in Atlantic City and as a result visited Harrah's Casino on Saturday, August 9, 2003. When they attempted to claim their "birthday cash" sometime between midnight and 12:30 a.m. on Sunday, August 10, 2003, at the Total Rewards Center, which remained open, the manager on duty told them they could not claim the money until 6 a.m. on August 10. Debra and Magda never redeemed their $15 coupons.
The other promotional solicitation, titled "Money Train," was received by Sheila in the mail sometime around the first week of August 2004, and redeemable August 16 or August 29, 2004. The advertisement read: "Harrah's Money Train" and "Catch a ride and win $10 to $1,000 guaranteed! August 16 or 29, 2004," and "You could win $1,000 instantly!". In a boxed-in portion of the advertisement, it stated:
This is your free ticket to ride on Harrah's Money Train[.] Come to Harrah's on August 16th or 29th between 8AM and midnight for a chance to win up to $1,000 instantly. Just present this postcard to the Total Rewards Center on one of the two dates to get your free game piece for a guaranteed cash prize! This postcard must be presented.
According to Sheila, the "Money Train" advertisement included, among other things, material terms that were obscured because of small type and the use of color, and that were unreadable without use of a magnifying glass.
As a result of their experiences with these promotional schemes, plaintiffs brought a three-count class action complaint against defendants, alleging violations of both the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20, and the Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-14 to -18, and breach of contract. The statutory claims were based, in part, on alleged violations of various administrative advertising regulations promulgated under both the Consumer Fraud Act and the Casino Control Act. After filing their answer, defendants moved to dismiss plaintiffs' complaint under Rule 4:6-2(e) for lack of jurisdiction or, alternatively, to remand the matter to the CCC. The motion judge, pursuant to Rule 4:6-2(e), dismissed the first two counts of plaintiffs' complaint alleging statutory causes of action, having determined *171 that the CCC has exclusive jurisdiction over the conduct of licensed casinos. She reasoned that because the Casino Control Act regulates casino advertising and promotions, and the CCC has promulgated detailed regulations addressing advertising and promotions, at the very least, the regulatory agency has primary jurisdiction in the matter, so it would be inappropriate and a waste of judicial resources for the court to address class action allegations before an interpretation is made by the CCC. However, instead of deferring to the agency and retaining jurisdiction, the judge dismissed the first two counts of plaintiffs' complaint with prejudice, concluding:
The Casino Control Commission was directed to promulgate . . . regulations on the subject matter and such regulations were, in fact promulgated. Those regulations are not the same as the regulations under the Consumer Fraud Act. As a result, a casino operator could comply with the Casino Control Act regulations and be in violation of the Consumer Fraud Act regulations. This is a direct conflict and results in the presumption of the applicability of the Consumer Fraud Act being overcome.[1]
Following this decision, which in effect vested the CCC with exclusive jurisdiction in the matter, the parties consented to a voluntary dismissal of the third count containing the common law breach of contract claim. This appeal follows.
Our review of a trial court's order of dismissal of a complaint pursuant to Rule 4:6-2(e) for failure to state a claim upon which relief may be granted, is plenary and we apply the same test as the Law Division. Thus, a motion to dismiss pursuant to Rule 4:6-2(e) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. Moreover, we do not owe deference to the trial court's determination of the legal question whether the CCC has exclusive jurisdiction over this dispute. Muise v. GPU, Inc., 332 N.J.Super. 140, 157, 753 A.2d 116 (App. Div.2000). We are not bound by a trial judge's "construction of the legal principles." Lombardo v. Hoag, 269 N.J.Super. 36, 47, 634 A.2d 550 (App.Div.1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Tp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Although the motion judge in this case seemed to use the terms "primary" and "exclusive" jurisdiction interchangeably, there is a meaningful difference. Under the latter, the Legislature has vested exclusive jurisdiction with an agency, which preempts a court's original jurisdiction over the subject matter. Campione v. Adamar of N.J., 155 N.J. 245, 260-63, 714 A.2d 299 (1998); Abbott v. Burke, 100 N.J. 269, 297, 495 A.2d 376 (1985); Town of Kearny v. Hackensack Meadowlands Dev. Comm'n, 344 N.J.Super. 55, 59-61, 779 A.2d 1124 (App.Div. 2001). The Legislature "may vest an administrative agency with exclusive primary jurisdiction over common-law claims," but only if it does so expressly, and by "explicitly" granting that agency the power to "award damages in private matters." Campione, supra 155 N.J. at 260-62, 714 *172 A.2d 299; see also Muise, supra, 332 N.J.Super. at 163-64, 753 A.2d 116. "As a general rule, jurisdiction of an administrative agency may be said to be exclusive when the remedy which the agency is empowered to grant is the only available remedy for the given situation." In re Hoboken Teachers' Ass'n, 147 N.J.Super. 240, 248, 371 A.2d 99 (App.Div.1977).
Under the doctrine of primary jurisdiction, on the other hand, "the case is properly before the court, but agency expertise is required to resolve the questions presented. . . ." Muise, supra, 332 N.J.Super. at 159, 753 A.2d 116 (quoting Boldt v. Correspondence Management, Inc., 320 N.J.Super. 74, 83-84, 726 A.2d 975 (App.Div.1999)). In such a circumstance, a "court declines original jurisdiction and refers to the appropriate body those issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." Id. at 158, 753 A.2d 116 (quoting Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 269 n. 1, 390 A.2d 566 (1978)). Thus,
when primary jurisdiction applies, the doctrine does not confer exclusive jurisdiction on an agency, with the attendant effect of limiting cognizable remedies to those within the agency's authority. On the contrary, a court can consider all judicial remedies, including damages, which are beyond the agency's authority.
[Id. at 163, 753 A.2d 116.]
There are two purposes underlying the doctrine of primary jurisdiction. The first is to allow an agency to apply its expertise to questions which require interpretation of its regulations. Id. at 159, 753 A.2d 116. The second is "to preserve uniformity in the interpretation and application of an agency's regulations." Id. at 160, 753 A.2d 116. As the Court in Campione explained with particular reference to the CCC:
The pervasiveness of the regulatory scheme controlling the casino industry indicates that the Legislature intended to invest the CCC with primary jurisdiction to regulate the casino industry. To the extent that the resolution of a plaintiff's claim depends on an interpretation of the Act or administrative regulations, the CCC should have the first opportunity to provide that interpretation. A referral to the CCC should assure the resolution of the controversy consistent with the views of the entity best positioned to consider the matter. Retaining primary jurisdiction in the courts could dislocate the intricate regulatory structure governing a sensitive industry. Permitting courts and juries across the State to interpret statutory and administrative regulations could introduce confusion where uniformity is needed. The lack of uniform interpretations, in turn, could effect [sic] the stability of the industry.
[155 N.J. at 264, 714 A.2d 299.]
In the past, our courts have had occasion to address the interplay of the Consumer Fraud Act with the regulatory schemes of administrative bodies other than the CCC. For instance, in Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 696 A.2d 546 (1997), a case involving loan packingthe practice of commercial lenders increasing the principal amount of a loan by combining the loan with loan-related services that the borrower does not wantthe Court held that the mere existence of an alternative regulatory scheme of the Department of Banking and Insurance did not automatically eliminate the applicability of the Consumer Fraud Act (CFA). Id. at 270, 696 A.2d 546. Indeed, "[i]n determining whether the existence of other regulations creates an exemption to *173 the CFA for particular conduct that otherwise would fall within its provisions, it should ordinarily be assumed that the CFA applies to the covered practice." Id. at 268, 696 A.2d 546. The Lemelledo Court stated:
We are loathe to undermine the CFA's enforcement structure, which specifically contemplates cumulative remedies and private attorneys general, by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law. The presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud.
[Id. at 270, 696 A.2d 546.]
Cf. Muise, supra, 332 N.J.Super. at 157, 165, 753 A.2d 116 (holding that trial court properly retained jurisdiction over customers' class action ordinary negligence claims against an electric utility seeking damages for power outages arising from high demand during a week-long heat wave, rather than defer to the Board of Public Utilities).
Even in the context of New Jersey's highly regulated casino industry, the Court has held that the Legislature "did not intend to prevent patrons from seeking vindication of common-law claims in the courts." Campione, supra, 155 N.J. at 260, 714 A.2d 299. In Campione, where the plaintiff claimed a casino discriminated against him for counting cards, id. at 249, 714 A.2d 299, the Court held that there was a common law cause of action for discrimination within the jurisdiction of the Law Division. Id. at 266, 714 A.2d 299. However, on the particular question of whether the CCC's regulations "implicitly permitted casinos to apply a separate set of rules to card counters seated at the same table as other patrons," the Court directed the Law Division to remand to the CCC "so that the agency may interpret its own regulations," the "kind" of issue that is "especially suited" for primary jurisdiction. Ibid.
As Campione makes clear, courts are not ousted of jurisdiction over common law damage claims against casinos merely because the claims arise from gambling transactions. See also Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1230, 1234-35 (3d Cir.1994) (holding that the Casino Control Act did not vest the CCC with exclusive primary jurisdiction over a gambler's claims against a casino for his losses). Rather, with specific reference to the Consumer Fraud Act, the test of preemption was explained in Lemelledo, supra, as follows:
In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied . . . that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility.
[150 N.J. at 270, 696 A.2d 546.]
Such a preemptive legislative intent has been found in the CCC's exclusive control of the regulation of the rules of casino games and of the content of gaming-related advertising. In Marcangelo v. Boardwalk Regency Corp., 847 F.Supp. 1222, 1224-25 (D.C.N.J.1994), aff'd on other *174 grounds, 47 F.3d 88 (3d Cir.1995), the plaintiff sued a casino for breach of contract, fraud and violation of the Consumer Fraud Act, seeking recovery of a primary jackpot and alleging that the signage on the face of a "Pokermania" slot machine was inadequate and defective, in that it failed to give fair notice of the rules of the game. Specifically, as explained by the district court:
Plaintiff achieved a royal flush while playing a progressive slot machine located in the defendant's casino. However, because the order of the cards was the reverse of the "sequential royal flush" indicated on the machine's signage, the plaintiff received only $1046.31, the value of the secondary jackpot. This amount was substantially less than the primary "Pokermania" jackpot of $187,000.
[Id. at 1224.]
The court held that the plaintiff's suit was preempted by the Casino Control Act, which gives the CCC exclusive authority to pre-approve all aspects of a slot machine, including program, odds and signage, even before the slot machine is installed on the casino floor, and in this case, the casino complied fully with all applicable statutory and regulatory requirements. Id. at 1226-28. Noting that the matter dealt with gaming regulations, which are at the heart of the CCC's authority, the court held that a cause of action for deceptive signage was preempted by N.J.S.A. 5:12-133(b):
Clearly, the authority to determine the adequacy of machine signage is a matter entrusted to the CCC under N.J.S.A. 5:12-100(h), which allows to [sic] Commission to adopt regulations establishing "such technical standards . . . as it may deem necessary to protect the player from fraud or deception and to insure the integrity of gaming." N.J.S.A. 5:12-100(h). Plaintiff's proposed common-law causes of action, if any, would therefore be preempted.
[847 F.Supp. at 1229.]
See also Decker v. Bally's Grand Hotel Casino, 280 N.J.Super. 217, 222, 655 A.2d 73 (App.Div.1994) (holding that the CCC has exclusive jurisdiction over patron claims that the casino violated Commission regulations regarding progressive jackpot slot machine signage), certif. denied, 136 N.J. 297, 642 A.2d 1006 (1994).
Preemptive intent was similarly found in Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173 (3d Cir.2000), cert. denied, 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001), involving the running of the highly regulated casino game of blackjack. There, blackjack players sued casino operators, alleging that the casino's cardcounting "shuffle-at-will" countermeasures and related advertisingall authorized by the CCCviolated, among other things, the Consumer Fraud Act. 232 F.3d at 188-89. In affirming the district court's dismissal of the claim, the Third Circuit held the Consumer Fraud Act did not apply to such a claim inasmuch as the regulation of the game of blackjack and related gaming advertising fell within the exclusive jurisdiction of the CCC. Ibid. Noting that the CCC's regulation of blackjack, including shuffling-at-will and related advertising "is more extensive than the entire administrative regulation of many industries," id. at 180, and that "the CCC has particularized expertise in these matters not possessed by courts and juries," id. at 188, the Third Circuit concluded that to "allow[ ] claims such as the appellants' proposed consumer fraud claim to proceed in the district court, we would interfere with the CCC's regulatory scheme." Ibid. The Court further explained:
In reaching our result on this point, we emphasize that the goals of the Consumer *175 Fraud and the Casino Control Acts are not entirely consistent. The Consumer Fraud Act is concerned with the protection of consumers. The Casino Control Act, however, has dual purposes that must be balancedthe protection of gambling patrons and the protection of the financial viability of the casino industry. N.J. Stat. Ann. § 5:12-1b (12) (West 1996). Thus, the Casino Control Act presupposes that the consumers as a group, i.e., the players, will lose their money, a contemplated result that hardly is the object of the Consumer Fraud Act.
[Id. at 189.]
Unlike the claims asserted in this case, those brought in Decker, Doug Grant and Marcangelo all dealt with highly technical areas of the rules of either casino games, casino gaming equipment, or gaming-related advertising, which are the subject of comprehensive regulation by the CCC, N.J.S.A. 5:12-69, -70(f), -70(o), and consequently fall within the special expertise of the agency. For instance, in both Doug Grant and Campione, the CCC, in its regulatory capacity, considered and addressed "specifically, concretely and pervasively" the effect of professional card counters on the game of blackjack, balancing on the one hand the interest of the consuming public and on the other the economic viability of the casino industry. Although in Campione, the Court permitted the plaintiff's discrimination claim to proceed after first deferring to the CCC's regulatory interpretation, in Doug Grant the court outright dismissed plaintiff's consumer fraud claim, "implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." 232 F.3d at 188. Thus, in Doug Grant, there existed a "real possibility of conflict" in the application of the dual regulatory schemes of consumer fraud and casino control. Ibid.
In contrast, we do not perceive such a conflict in the application of the Consumer Fraud Act to the advertising activities in issue here. There is nothing highly sophisticated or technical about defendants' two promotional schemes. There is no reference in either advertisement to the heavily regulated rules of the game or gaming equipment. On the contrary, the challenged advertising simply involves vouchers that resemble coupons used to promote casino visitation and patronage, similar in type to those ads used to entice patronage of any other business. Simply put, the two advertisements are bereft of any content which calls upon agency expertise or prerogative to which a court need defer. Rather, the ads in issue raise only ordinary questions whether they contain false, deceptive or misleading statementsthe type no one argues is within the CCC's primary, much less exclusive jurisdiction to answer. Indeed, the agency has no special preemptive competence to judge the fairness of these ads. On the other hand, it is well within the conventional experience of courts to address consumer fraud issues. Richardson v. Standard Guar. Ins. Co., 371 N.J.Super. 449, 479, 853 A.2d 955 (App.Div.2004).
To be sure, the Casino Control Act regulates all manner of casino advertising, including presumably the ads in issue here. However, that does not mean the CCC has usurped the entire field. As the Campione Court noted, "the Legislature did not intend to prevent patrons from seeking vindication of common-law claims in the courts." 155 N.J. at 264-65, 714 A.2d 299. Indeed, for purposes here relevant, both the consumer fraud and casino control schemes regulate with a mutual view toward "assuring that such advertisements are in no way deceptive." Compare N.J.S.A. 5:12-70(o) and N.J.A.C. 19:43-14.2 *176 with N.J.S.A. 56:8-2. Thus, to the extent, if at all, that plaintiffs' consumer fraud claims implicate advertising regulations under the Casino Control Act, we discern "no direct and unavoidable conflict" between the dual regulatory schemes despite the trial court's speculative and unsupported finding to the contrary; nor do we perceive that judicial construction would affect the uniformity of the interpretation or application of the Casino Control Act's statutory or regulatory requirements. We conclude, therefore, that it was error for the trial judge to have dismissed the first two counts of plaintiffs' complaint alleging statutory causes of action based on the alleged false and misleading nature of defendants' casino advertisements, and direct they be reinstated. Indeed, any other result would leave plaintiffs remediless since the Casino Control Act clearly does not empower the CCC to award damages in private matters. Campione, supra, 155 N.J. at 249, 260-62, 714 A.2d 299.
Reversed and remanded for proceedings consistent with this opinion.
NOTES
[1] To the extent count two, alleging a violation of the Truth-in-Consumer Contract, Warranty and Notice Act, was based on a violation of the regulations promulgated under the Consumer Fraud Act, the judge dismissed this count for the very same reasons she dismissed count one.